*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re DAVIS/BREIHOLZ/KRAJENKE/KELLEY/
MATA, Minors.

UNPUBLISHED
January 11, 2024

No. 365043
Sanilac Circuit Court
Family Division
LC No. 16-036050-NA

Before: K. F. KELLY, P.J., and JANSEN and HOOD, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court's order terminating her parental rights to the minor children, DD, DB, LB, EK, JK, and BM. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Respondent has six children fathered by four different men.[1] The children currently range in ages from 4 to 16 years old. Respondent's history with Children's Protective Services ("CPS") dates back to 2011 and includes at least 18 CPS investigations, court intervention, and removal of the children from respondent's home. In November 2016, the court removed the children, assumed jurisdiction, and thereafter ordered respondent to participate in and benefit from a case service plan. Approximately a year later, in December 2017, the children were released to respondent's care, the 2016 petition was dismissed, and the court terminated its jurisdiction.

In the period that followed, CPS continued to regularly investigate respondent for allegations of physical neglect, threatened harm, and improper supervision. In July 2020, petitioner, the Department of Health and Human Services ("DHHS"), filed a petition requesting "in-home jurisdiction" and an order granting it access to respondent's home to insure its suitability and the children's safety. During the investigation, at least two fathers admitted to a CPS worker

---

[1] During the lower court proceedings, the court entered orders terminating the parental rights to all the fathers, either after a termination hearing or after a voluntary release of parental rights. None of the fathers are a party to this appeal.

that they were aware of respondent's use of heroin and methamphetamine and the poor condition of her home.

Days after the filing of this initial petition, events occurred that compelled DHHS to file an amended petition requesting that the court exercise jurisdiction and remove the children from respondent's home. After respondent entered a plea of admission in February 2021, the court found statutory grounds to assume jurisdiction over the children. At the dispositional hearing in March 2021, the trial court ordered respondent to comply with a treatment plan designed to address her substance abuse issues, mental health concerns, and her poor parenting skills. The court also ordered respondent to complete the inpatient treatment program at Odyssey House.

During the year that followed the adjudication and disposition, respondent was in and out of residential treatment facilities and, when she was not in inpatient treatment, she was incarcerated in the Sanilac County Jail. Ultimately, in March 2022, DHHS petitioned the court to terminate respondent's parental rights. After several hearings held between April 2022 and December 2022, the court concluded that statutory grounds to terminate respondent's parental rights to all of her children under MCL 712A.19b(3)(c)(*i*), (g), and (j) were established by clear and convincing evidence. Further, the court found that termination of respondent's parental rights was in the children's best interests. This appeal followed.

## II. STATUTORY GROUNDS

In her first issue on appeal, respondent challenges the trial court's findings regarding the statutory grounds for termination. We disagree.

## A. STANDARD OF REVIEW

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

## B. ANALYSIS

"To terminate parental rights, a trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Brown/Kindle/Muhammad*, 305 Mich App 623, 635; 853 NW2d 459 (2014) (quotation marks and citation omitted). Under MCL 712A.19b(3)(c)(*i*), the trial court may terminate a respondent's parental rights if the court finds by clear and convincing evidence that:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

The trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*). The evidence established that respondent had a long history with CPS. Between 2011 and 2016, CPS investigated respondent 18 times for complaints related to physical neglect, substance abuse, improper supervisions, and threatened harm. During this period, respondent was offered voluntary services. In 2016, DHHS filed a neglect and abuse petition. The court took jurisdiction, removed the children from respondent's home, and ordered respondent to comply with a case service plan. After approximately a year, the children were returned, the petition was dismissed, and the court dismissed its jurisdiction.

In the years that followed, CPS continued to investigate abuse and neglect complaints. Respondent declined voluntary services and refused to cooperate with CPS's efforts to determine the children's well-being and the condition of the home. The circumstances became particularly dire in the summer of 2020 when respondent left then one-year-old BM and seven-year-old DB in the care of two men. While in the care of these individuals, one of the men died from a suspected overdose. The children were discovered in the man's filthy home during the police investigation that followed. DHHS petitioned the court to remove the children from respondent's care. Respondent then attempted to thwart DHHS's execution of an ex parte order to take the children into protective custody by concealing their whereabouts. When DHHS finally found five of the six children, they were in deplorable physical condition. EK, however, was not with his siblings. He was located two days later when law enforcement made a traffic stop of respondent's vehicle. EK was found in respondent's car, along with drugs and drug paraphernalia. Similar to his siblings, EK was filthy and his clothes were dirty and ill-fitting.

While the parties awaited adjudication of the petition, respondent was arrested in January 2021 and charged with drug possession and driving with a suspended license. In February 2021, respondent pleaded guilty to the charges and she was sentenced to one year in jail or, in lieu of jail time, the option to complete a long-term inpatient substance abuse program. Respondent elected to participate in inpatient treatment at Odyssey House-Saginaw.

In February 2021, respondent also entered a plea in this child protective proceeding during which she admitted that she had a substance abuse problem that affected her ability to properly care for her children and that she was arrested and incarcerated. On the basis of these admissions, the court took jurisdiction over the children. During the dispositional hearing that followed, respondent was ordered to comply with and benefit from a treatment plan designed to address her mental health and substance abuse issues and improve her parenting skills. Of particular note, she was also ordered to successfully complete a long-term inpatient substance abuse program. Approximately two years later, much more than 182 days after entry of the initial dispositional order, DHHS filed a supplemental petition seeking termination of respondent's parental rights. The petition alleged, among other things, that respondent failed to benefit from the services offered.

During the review hearings held between May 2021 and February 2022, and at the termination hearing held between April 2022 and December 2022, DHHS presented evidence that respondent did not substantially comply with or benefit from her treatment plan. The evidence also clearly and convincingly established that there was no reasonable likelihood that respondent would be in a position to safely and appropriately parent her children within a reasonable time.

The evidence also clearly and convincingly demonstrated that respondent had not overcome the most significant barriers to reunification, i.e., her substance abuse issues and her mental health concerns. At the time of the initial disposition in March 2021, she was participating in an inpatient substance abuse program at Odyssey House in Saginaw. After three months in this program, she was discharged in May 2021 for failing to comply with the facility rules. Immediately after leaving this program, respondent relapsed. A drug screen administered near the relapse was positive for both cocaine and THC. Shortly after the relapse, respondent was admitted into another Odyssey House inpatient program in early June 2021. Respondent stayed with this program for approximately six months before she was discharged on December 15, 2021, for noncompliance with the rules. Although respondent knew that she was required to report to the Sanilac County Jail to complete the term of her sentence, she waited five days before turning herself in.

Respondent was incarcerated for approximately one month, before she was released on January 31, 2022, and allowed to report to an inpatient rehabilitation program at Grace Centers of Hope. In this program, respondent was required to attend programming in the morning, but in the afternoons she was permitted to leave the facility. When the caseworker discovered that respondent was no longer in jail, she met with respondent at Grace. During this meeting, respondent disclosed that she was not participating in any mental health services and she was not taking any of her prescribed medications. The caseworker testified that respondent had not taken medications prescribed to treat her mental health issues since her stay at Odyssey House.

After residing at Grace for approximately a month, a bench warrant was issued on February 23, 2022, for respondent's arrest because it was determined that respondent's participation in the Grace program had not been approved by the court presiding over her criminal case. Respondent again turned herself in to the Sanilac County Jail on April 4, 2022.

Respondent was incarcerated at the time the termination hearing began on April 27, 2022. She was released sometime in September 2022, while the termination hearing was in progress. The caseworker testified at the October 26, 2022 continued termination hearing that after respondent was released from jail in early September 2022, she completed a 14-day inpatient detoxification program at Sacred Heart. Then, after this program, respondent complied with DHHS drug screens. On October 4, 2022, respondent tested positive for marijuana. During her testimony, respondent claimed that she was in recovery, that she had been clean for 17 months, and that she had not abused any drugs since her relapse in May 2021. Respondent had no idea why she tested positive for marijuana on October 4, 2022, but she did admit that as a term of her probation, she was not permitted to use any drugs, legal or illegal.

Respondent admitted that she had a methamphetamine addiction and that she used drugs to "cope with life." She claimed, however, that she had been in recovery and clean and sober for months. Yet the evidence clearly and convincingly demonstrated that despite several admissions to inpatient rehabilitation facilities and a multitude of services over a two-year period, respondent had not overcome her substance abuse issues or addressed her mental health concerns. Accordingly, at the time of termination, there was clear and convincing evidence that the conditions that led to the adjudication continued to exist. Further, the record clearly established that the obstacles to reunification would not be removed within a reasonable time. Respondent was given two years to make meaningful changes in her life, but she was unwilling or unable to

do so. During her months in inpatient treatment, she had no other obligations and was free to focus on overcoming her addiction. She was unable to comply with the rules and fully engage in the programs. As a consequence, she was twice discharged from inpatient treatment. Considering this history, there existed clear and convincing evidence from which the court could conclude that respondent was not reasonably likely to overcome the barriers to reunification within the foreseeable future.

There was no evidence that if respondent were allowed additional time, the end result would be any different. Admittedly, in the few months before the completion of the termination hearing, respondent had taken some initiative. Although she did not provide any verification to her caseworker, respondent was allegedly participating in weekly therapy, attending NA/AA meetings, applying for Section 8 housing, and had submitted one employment application. Considering the timing, however, respondent's actions appear to be motivated more by the winding down of the termination hearing than the sudden desire to be reunited with her children. In any event, there is little evidence that respondent's last-ditch compliance with the treatment plan represented a forward trend. This is particularly true considering that respondent tested positive for marijuana during the termination hearing and had not provided any verification she was receiving treatment for her mental health. Consequently, there was clear and convincing evidence from which the court could conclude that the conditions that led to the adjudication would not be rectified within a reasonable time.

Termination of parental rights under § 19b(3)(c)(*i*) is warranted when "the totality of the evidence amply supports" a finding that the parent has not achieved "any meaningful change" in the conditions that led to the trial court assuming jurisdiction of the child. *In re Williams,* 286 Mich App 253, 272; 779 NW2d 286 (2009). DHHS met this evidentiary burden by clear and convincing evidence. Accordingly, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights under § 19b(3)(c)(*i*).

## III. REASONABLE EFFORTS

Respondent also argues that the trial court erred by terminating her parental rights because DHHS failed to make reasonable efforts to reunite her with her children. We disagree.

### A. STANDARD OF REVIEW

Because respondent never challenged the adequacy of the services provided, this issue is unpreserved. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). Accordingly, it is reviewed for plain error affecting substantial rights. *Id.* "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999); see also *In re VanDalen*, 293 Mich App 120, 135, 809 NW2d 412 (2011). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App at 9.

### B. ANALYSIS

Generally, before a court may contemplate termination of a parent's parental rights, the DHHS must make reasonable efforts to reunite the family. MCL 712A.19a(2). Reasonable efforts must be made in all cases except those involving the circumstances delineated in MCL 712A.19a(2), which are not applicable here. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "[T]he department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Sanborn,* 337 Mich App 252, 259; 976 NW2d 44 (2021) (citation omitted). DHHS's statutory duties to update a parent's treatment plan and provide the parent with necessary and relevant reunification services continue throughout the case. *In re Mason,* 486 Mich at 156. "The adequacy of the [DHHS]'s efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009).

After reviewing the record, it is readily apparent that DHHS made reasonable efforts to reunify respondent with her children and that the termination of respondent's parental rights was a product of her failure to participate in and benefit from services rather than the adequacy of DHHS's efforts. Respondent asserts that reasonable efforts required that DHHS actually implement services rather than simply defer to the services provided in the various residential facilities. Respondent specifically suggests that DHHS could have provided additional services telephonically to address respondent's psychological needs and to assist her in dealing with the children and their needs. She further argues that after the suspension of her parenting time in June 2021, DHHS made no effort to reinstate respondent's visits. Respondent's vision of how her case service plan could have or should have been implemented is simply unrealistic. Given respondent's circumstances, DHHS more than complied with its statutory obligations.

At the outset, it should be recalled that this case was not respondent's first participation in a child protective proceeding. In 2016, the court removed her children for reasons similar to those present in the instant case. At that time, respondent was offered and ordered to participate in a case service plan for approximately a year, after which her children were returned to her care. Services included foster care case management, random drug screens, individual and substance abuse counseling, a substance abuse assessment, a psychological evaluation, employment support services, parenting classes, transportation assistance, life-skills training, and financial support. At the initial disposition in March 2021, respondent was ordered to comply with a fairly typical case service plan that included, among other things, random drug screens, parenting classes, parenting time, and substance abuse counseling. In addition, the court specifically ordered respondent to participate in and complete inpatient treatment at Odyssey House.

During the overwhelming majority of this case, respondent was either enrolled in a residential treatment program or incarcerated in the Sanilac County Jail. The Odyssey House employed a cognitive behavioral modification program. There was testimony during the dispositional review hearings and at the termination hearing that the Odyssey House program offered respondent a multitude of services that complied with the letter and spirit of her case service plan. Odyssey House required that residents participate in daily peer recovery group therapy, drug screens, and weekly individual counseling. Each client was assigned a recovery coach. There was also a medical department that monitored respondent's medication prescribed for her mental health issues. During her incarceration at the Sanilac County Jail, respondent participated in several programs, including, life-skills, anger management, and the Nurturing Families program.

Respondent vaguely suggests that DHHS could have done more, including providing some sort of telehealth treatment. But it is unclear how respondent would have fared better talking to a therapist over the phone compared to the in-person, face-to-face counseling she received for several hours every day. Further, the caseworkers explained that while respondent was in residential inpatient treatment, DHHS was not allowed to provide or bring outside services into the facility. Respondent was simply expected to participate in and benefit from the services offered by Odyssey House.

Respondent also takes issue with the efforts DHHS made relative to her parenting time. However, when considering the entire record in this regard, it is clear that DHHS did what was required to protect respondent's rights and ensure the children's well-being. The children were removed from the home in July 2020. While the matter awaited adjudication, respondent was offered supportive visitation beginning in August 2022. After respondent's arrest in January 2021 and her decision to enter inpatient treatment in February 2021, the Odyssey House and DHHS cooperated to facilitate off-site parenting time between respondent and her children. Odyssey House transported respondent to parenting time and DHHS supervised the visits. During these visits, respondent was also offered hands-on assistance though a supportive visitation program. In addition, DHHS engaged the children's therapist to further assist respondent during parenting time. These efforts ended when the court suspended respondent's parenting time in June 2021.

Respondent argues that DHHS never had a plan to reinstate her parenting time. The record indicates that the court suspended respondent's visits with the children following a full hearing at which it considered the testimony of a child therapist, two foster mothers, and the foster care caseworker. The court also considered respondent's relapse in May 2021. The court held that parenting time, even if supervised, was harmful to the children. It found compelling the testimony that, before and after visits with respondent, the children exhibited extreme behavioral issues that indicated that the visits were taking a toll on the children's physical, emotional, and mental well-being. During the termination hearing, the caseworker testified that the children's therapists had not recommended the reinstatement of visits. Indeed, one of the therapists testified that the children would be harmed if contact with respondent resumed. Considering the record in its entirety, DHHS's actions relative to parenting time were reasonable under the circumstances.

This matter was before the trial court for more than two years. Despite respondent's representations to the contrary, the record confirms that, from the beginning, DHHS did everything possible to facilitate reunification efforts. Although DHHS "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey,* 297 Mich App 242, 248; 824 NW2d 569 (2012). "Not only must respondent cooperate and participate in the services she must benefit from them." *In re TK,* 306 Mich App 698, 711; 859 NW2d 208 (2014). The record indicates that DHHS, as well as other agencies, offered respondent several services to help reunify her with the children, but respondent did not complete and benefit from the services that were offered. Under these circumstances, respondent's assertion that DHHS failed to make reasonable efforts toward reunification lacks merit, and we affirm.

IV. BEST INTERESTS

Lastly, respondent challenges the trial court's finding that termination of her parental rights was in the children's best interests. We disagree.

## A. STANDARD OF REVIEW

Once a statutory ground for termination has been established, the trial court must find that termination of parental rights is in the child's best interests before it may terminate an individual's parental rights. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error the trial court's findings regarding a child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

## B. ANALYSIS

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White,* 303 Mich App at 713. These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id.* at 713-714. In addition, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen*, 293 Mich App at 142. The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones,* 286 Mich App 126, 131; 777 NW2d 728 (2009).

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White,* 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss,* 301 Mich App at 87. Particularly relevant to this case, when more than one child is involved, a trial court must consider each child's best interests separately. *In re Olive/Metts,* 297 Mich App at 42. A trial court need not, however, make "individual" and "redundant factual findings" if the children's interests do not significantly differ. *In re White*, 303 Mich App at 715-716.

Although the children shared many of the same needs and interests, in several respects they were not similarly situated. Approximately 12 years separated the oldest and the youngest siblings. Moreover, two of the children were in relative care, and the other four children were placed with what could appropriately be considered fictive kin. The trial court recognized the differing attributes and, in its opinion, it considered the best interests of each child individually. The trial court did not clearly err when it found that termination of respondent's parental rights was in each child's best interests.

DD, respondent's oldest child, was 15 years old at the time of termination. Although he was, for a period, placed with two siblings in the foster home of fictive kin, at the time of termination the plan was to return DD to the home of his fictive grandmother. Over the years, this individual had cared for DD on and off. Considering this history, we agree with the trial court that DD could not have any sense of stability or permanence living with respondent, and a preponderance of the evidence established that respondent was unable to provide these things for him. The evidence also demonstrated that the bond between respondent and DD was not healthy, secure, or appropriate. DD was old enough to be acutely aware of the events that traumatized him and his younger siblings. He struggled with understanding respondent's failure to act in the children's best interests. DD expressed a lot of resentment, anger, and frustration toward respondent. By contrast, DD was doing well placed outside of respondent's care. DD had no wish to reunite with respondent, and he was willing and eager to resume living with his fictive grandmother, who had provided for DD's needs in the past and she was willing to do so in the future, eventually through a guardianship.

When contemplating a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts,* 297 Mich App at 42. Considering the foregoing, the relevant factors, on balance, weighed in favor of terminating respondent's parental rights to DD.

Nine-year-old DB and eight-year-old LB were placed with fictive kin, K. Mata. A bond existed between K. Mata and the children in her care. Both DB and LB referred to K. Mata as "mom." Both children had been diagnosed with posttraumatic stress disorder and were in therapy. Both also engaged in sexualized talk and behavior. LB, in particular, acted out sexually toward his classmates and he had reported witnessing respondent engaging in sex. The caseworker opined that no bond existed between respondent and these two children. Particularly compelling testimony came from the children's therapist, who opined that failing to terminate respondent's parental rights would be detrimental to these two children.

In addition, DB and LB were doing well in K. Mata's care. There was testimony that Mata instilled a lot of structure and consistency into her foster home. The children, while in her care, regularly attended school and counseling, and Mata addressed the children's behaviors in a consistent and appropriate manner. There was testimony that should the court terminate respondent's parental rights, K. Mata was willing to adopt DB and LB.

The evidence demonstrated that respondent was unwilling or unable to make meaningful changes to establish the stability necessary to properly parent her children and provide them with a safe and stable home environment. A preponderance of the evidence supports the court's finding that K. Mata's home was preferable to respondent's home because it would provide DB and LB with the care they required to facilitate their continued growth and development.

During the termination hearing, the court granted a request to place EK with C. Kwasniewski, who was the former girlfriend of EK's father and the mother of EK's half-brother. Kwasniewski had cared for EK in the past, EK continued to frequently visit her home on the weekends, and Kwasniewski provided respite care when EK was placed in another foster home. Kwasniewski wished to adopt EK should respondent's parental rights be terminated. Moreover, continued placement with EK would permit the child to be raised with a biological half-sibling.

Thus, the trial court did not err when it found that these factors weighed in favor of terminating respondent's parental rights.

Five-year-old JK and three-year-old BM were placed together in the home of their paternal aunt. There was testimony that after visits with respondent, BM found it difficult to take direction and control her behaviors. JK similarly had behavioral issues and he struggled in school. While in their aunt's care, JK made significant strides with his speech development. The aunt also wished to adopt both children. The trial court acknowledged that JK and BM were placed with a relative and that this is a factor that favored reunification, but it went on to properly balance relative placement with other relevant factors. Although placement with a relative weighs against termination, and such a placement must be considered, a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. In this case, the trial court properly balanced relevant factors and did not clearly err by finding that termination of respondent's parental rights to JK and BM was in their best interests, despite this placement with a relative.

On this record, the trial court did not clearly err when it found that termination of respondent's parental rights was in the six children's best interests. Respondent could not safely and appropriately care for her children, and continuing a parent-child relationship would have been detrimental to the children's physical, educational, and emotional well-being. The court properly weighed the appropriate factors when considering all of the children's best interests. On balance, a preponderance of the evidence weighed in favor of terminating respondent's parental rights.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Kathleen Jansen
/s/ Noah P. Hood